Upon review of the competent evidence of record with reference to the errors assigned, and finding no good grounds to receive further evidence or to rehear the parties or their representatives, the Full Commission upon reconsideration of the evidence modifies and affirms the Opinion and Award of the Deputy Commissioner.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. The parties are bound by and subject to the provisions of the North Carolina Workers' Compensation Act.
2. An employer/employee relationship existed between plaintiff and defendant-employer at all relevant times.
3. Federated Mutual Insurance Company is the carrier on the risk.
4. Plaintiff sustained a compensable work-related back injury on 6 May 1997. Defendants accordingly filed a Form 60, Employer's Admission of Employee's Right to Compensation on 5 June 1997.
5. Plaintiff's average weekly wage is to be determined by a Form 22 Wage Chart. Plaintiff's compensation rate is $257.42 per week.
6. The parties further stipulated into evidence the following documents:
A. Industrial Commission Forms; 18, 19, 33 and 33R.
B. All employment and payroll records pertinent to plaintiff;
C. Plaintiff's medical records as follows:
(i) Medical records as follows:
(ii) Asheville Memorial Hospital (24 pp.)
(iii) Dr. Charles Branch (20 pp.)
(iv) Dr. Stephen Glazier (4 pp.)
(v) Thomas Rehabilitation (29 pp.)
(vi) Dr. Mark Moody (2 pp.)
(vii) Frye Regional Medical Center (4 pp.)
(viii) Hickory Orthopedic (10 pp.)
(ix) Dr. Harvey Russworm (5 pp.)
(x) Catawba Radiological Associates (1 p.)
 ***********
Based upon all of the competent evidence adduced from the record, the Full Commission makes the following additional:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, plaintiff was a 44 year old married male with an 11 year old child. He is a high school graduate and attended Wilkes Community College for one year. Plaintiff worked six years for defendant-employer Colvard Oil Company driving a truck. He was also a truck driver for many years with Singer Furniture.
2. On 6 May 1997, plaintiff was employed by defendant-employer as a truck driver hauling asphalt. While pulling a tarp over the cargo in his truck, he felt a sudden pain in his back. The tarp weighed approximately 150 pounds, and although it was supposed to have spring assistance, the springs were broken and plaintiff was required to lift the entire weight himself. Plaintiff has also reported that on the day of his injury he was carrying large tree limbs in his truck and hurt his back while unloading them. Plaintiff's injury occurred late in the work day, and he was able to complete his shift.
3. Plaintiff's claim was accepted as compensable by defendants pursuant to a Form 60 dated 5 June 1997, and plaintiff was paid temporary total disability beginning from the date of injury. Plaintiff's medical bills were paid until 19 January 1998.
4. Immediately following his injury, plaintiff presented to Asheville Memorial Hospital Emergency Room. Within a day or two, plaintiff presented to Dr. Russworm, his family physician. On 19 May 1997, plaintiff underwent an MRI which showed mild degenerative disc and facet changes at L5-S1 and a mild posterior disc bulging at L5-S1. Plaintiff was diagnosed with lumbar strain and treated conservatively for several weeks, including physical therapy, which worsened his condition. When plaintiff's symptoms did not resolve, he was referred to Dr. Peter Hurley, an orthopedic specialist with Hickory Orthopedics Center, P.A.
5. Dr. Hurley first examined plaintiff on 18 June 1997. Plaintiff reported that he was injured at work on 5 May 1997 when he was lifting "something up". Dr. Hurley noted that plaintiff had been treated since the date of the injury with medications and physical therapy but reported only minimal improvement. Dr. Hurley wrote plaintiff out of work and scheduled a follow-up for three weeks later.
6. Dr. Hurley next examined plaintiff on 10 July 1997, and noted continued significant back pain. At that time, he opined that plaintiff may have sustained a tear in his annulus of one of his discs and put him on a steroid dose pack. On 24 July 1997, Dr. Hurley again noted continuing back pain and expressed the opinion that physical therapy was causing plaintiff irritation. Dr. Hurley recommended that plaintiff be given an epidural steroid injection, and that therapy be discontinued unless the epidural proved successful. Dr. Hurley continued plaintiff's out of work status.
7. On 13 August 1997, after several months of conservative treatment without appreciable result, Dr. Hurley ordered a second MRI for plaintiff's lower spine which he underwent on 19 August 1997. The MRI report was received on 27 August 1997, and showed that plaintiff had a possible herniated disc at L5-S1. Plaintiff also continued to have debilitating pain in his buttocks region. Dr. Hurley believed that plaintiff was a candidate for surgery, and referred him to a surgical spine specialist, Dr. Jeff Knapp, for further evaluation and possible surgery. Defendant-carrier, however sent plaintiff to a surgeon of its choice.
8. Plaintiff was referred to Dr. Mark L. Moody by the carrier for a second opinion on 4 September 1997. Although after a one time evaluation Dr. Moody confirmed Dr. Hurley's diagnosis of a herniated disc at L5-S1, he disagreed that plaintiff was a surgical candidate at the time. Dr. Moody recommended that plaintiff be placed in a functional restoration program for chronic pain management prior to consideration for an L5-S1 fusion.
9. Plaintiff was referred by Dr. Moody to Dr. Freeman E. Broadwell, III, at Thomas Rehabilitation Hospital in Asheville, North Carolina for follow-up treatment. Dr. Broadwell first consulted with plaintiff on 2 October 1997. According to Dr. Broadwell, plaintiff was frustrated at his condition and continued to have a great deal of pain.
10. Plaintiff was treated for several months by Dr. Broadwell. Dr. Broadwell wrote to defendant-carrier on 20 December 1997 that plaintiff was able to return to work at not more than a sedentary to mid-level physical effort with the ability to change positions as necessary. Defendant-carrier provided Dr. Broadwell with a job description for a convenience store clerk position which Dr. Broadwell stated appeared to be within plaintiff's restrictions.
11. Plaintiff was ordered to return to work for defendant-employer on 26 January 1998 as a convenience store clerk. Plaintiff was required to lift what he called a "money safe" which weighed, in his estimation, approximately 75 pounds, from the floor safe to the counter. Since the actual safe weighs between 150 and 200 pounds and is a permanent fixture, the Full Commission finds that the money safe to which plaintiff refers is most likely a cash box held within the safe. Plaintiff was also required to run the Deli section of the store, which involved refilling the hot dogs, condiments, and drink coolers, in addition to returning to the main counter area to check customers out. When not otherwise engaged in these duties, plaintiff helped with stocking boxes of merchandise. Plaintiff testified that he was not able to sit down all day, and when he left he could barely walk. Plaintiff was able to perform his job for one day but had such severe pain that he was forced to seek additional medical treatment that same day. Accordingly, plaintiff reported to Asheville Memorial Hospital Emergency Room on 26 January 1998. The medical notes indicated a herniated disc since 5 May 1997, and an attempt to return to work with an increase in pain. Plaintiff was advised by the Emergency Room treating physician that he should rest his back until he was evaluated by a neurosurgeon.
12. Plaintiff was given a note by the Emergency Room physician to remain out of work until further evaluation by Dr. Glazier on 30 January 1998. Following receipt of this information from the Emergency Room, defendant-employer immediately forwarded same to Dr. Broadwell, who also stated that plaintiff should be released from work until 30 January 1998 at which time he would see Dr. Glazier for additional treatment.
13. On 28 January 1998, two days after plaintiff attempted to return to work, he was terminated from further employment with defendant-employer, and all workers' compensation benefits, including temporary total disability benefits, and medical compensation were unilaterally terminated by defendant, even though defendant knew that plaintiff's return to work was unsuccessful.
14. Following defendant-carrier's refusal to reinstate plaintiff's benefits, a Form 28U "Employee's Request that Compensation be Reinstated After Unsuccessful Trial Return to Work" was sent to Dr. Freeman Broadwell and signed by him on 26 March 1998, indicating that plaintiff was prevented from continuing his trial return to work due to the injury for which compensation was being paid. On 29 June 1998, by order of Executive Secretary Tracey H. Weaver, the Industrial Commission ordered defendant to reinstate plaintiff's temporary total disability compensation.
15. Plaintiff's temporary total disability benefits have been reinstated. However, as of the date of the hearing before the Deputy Commissioner, defendant-carrier had refused to pay for any medical treatment since January 1998. Defendants' refusal to reinstate plaintiff's medical compensation was unreasonable. The evidence of record establishes that defendants were notified by the Asheville Memorial Hospital Emergency Room physician that plaintiff was provided with a note to remain out of work until further evaluation by Dr. Glazier. This information was forwarded by defendants to Dr. Broadwell, who agreed that plaintiff should be released from work until he was evaluated by Dr. Glazier. Dr. Glazier referred plaintiff to Dr. Branch, who ultimately performed plaintiff's surgery.
16. On 30 January 1998, plaintiff consulted with neurosurgeon Steven S. Glazier, of the Wake Forest University School of Medicine. Plaintiff told Dr. Glazier that he had been injured in May, 1997 at work while pulling a tarp back on his dump truck. After reviewing all medical records and both MRIs, Dr. Glazier recommended a posterior lumbar interbody fusion at L5-S1. Dr. Glazier referred plaintiff to his partner, Dr. Charles M. Branch, who was also a spinal neurosurgeon, specializing in complicated spinal problems.
17. Plaintiff presented himself to Dr. Branch on 22 April 1998. According to Dr. Branch, plaintiff's MRI revealed a herniated disc at L5-S1, likely secondary to his work-related injury in May 1997. Dr. Branch ordered a third MRI in April 1998, prior to surgery to determine whether there had been a progression of the disc space collapse since the time of injury. Dr. Branch's impression based upon this third MRI was that there had been an evolution or progression to the point where plaintiff now had a herniation or ruptured disc causing his problem.
19. Dr. Branch recommended that plaintiff undergo surgery at L5-S1. Surgery was subsequently scheduled for 11 May 1998.
20. According to Dr. Branch, plaintiff had a good work history, and was able to maintain full-time employment although he had consistently reported back problems since his work injury in May 1997. Dr. Branch opined that the condition of plaintiff's spine was consistent with the work injury reported by plaintiff in May 1997. It is not uncommon for something to start as a protrusion, and over the course of a year, progress to a full-blown herniation.
21. During the surgery, Dr. Branch observed that the entire back wall of plaintiff's disc base had been disrupted, and it was "like a giant mound of disc protruding back into the spinal canal."
22. Plaintiff was released from the hospital on 14 May 1998, and advised by Dr. Branch that he was totally unable to work for at least three to six months after surgery.
23. After plaintiff's release from surgery, Dr. Branch wrote Dr. Russworm a letter indicating that plaintiff's symptoms were consistent with, and related to the work-related injury he sustained in May 1997. Plaintiff again consulted with Dr. Branch for follow-up treatment on 2 September 1998. At that time, Dr. Branch confirmed that plaintiff was making progress, but still totally disabled and could not return to work of any type. Dr. Branch also saw plaintiff on 27 January 1999. On 26 May 1999, Dr. Branch gave plaintiff a 25% permanent partial disability rating to his spine as a result of his May 1997 injury. At that time, he stated that plaintiff could probably work in a sedentary position if he could move around, sit and stand, and not lift anything over 25 to 30 pounds, although any type of job would cause plaintiff continuing discomfort which would probably affect his ability to maintain employment.
24. Plaintiff is not able to return to his former job with defendant-employer. Further, due to plaintiff's physical restrictions set by Dr. Branch, his current medical condition including his level of pain, his limited education and his prior work experience which was primarily limited to driving a truck, it is unlikely that plaintiff could obtain and maintain employment elsewhere. For these reasons, plaintiff remained totally disabled at the time he reached maximum medical improvement on 26 May 1999; however, plaintiff would benefit from a program of vocational rehabilitation.
25. During the time he was out of work, plaintiff occasionally sold used cars owned by his mother from his mother's yard. This involved responding to the arrival of an interested party, answering questions regarding the car, and accepting or rejecting an offer of purchase. Plaintiff testified that he received no income from this activity, but turned over any money received to his mother. This employment was extremely sporadic and involved so little effort on the part of plaintiff that it is deemed not indicative of an ability to perform work and earn wages as a used car salesman in the competitive marketplace.
26. The parties participated in a mediated settlement conference pursuant to an Order of the Commission dated 25 March 1998. On 12 August 1998, the mediation was held and an agreement was reached between the parties. The parties signed a handwritten memorandum of the settlement, pending the execution by plaintiff of a clincher agreement. While returning home from the conference, plaintiff determined that he did not wish to follow through with the agreement, and did not prepare a clincher agreement.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission enters the following:
 CONCLUSIONS OF LAW
1. Plaintiff's claim for the work-related injury in May 1997 has already been accepted as compensable on a Form 60 "Employer's Admission of Employee's Right to Compensation Pursuant to N.C. Gen. Stat. §97-18(b)." However, payment of compensation pursuant to a Form 60 does not provide plaintiff with a presumption of disability. Sims v.Charmes/Arby's Roast Beef, (No. COA99-1402, N.C. App., 6 February 2001). Plaintiff has met his burden of showing that he has been totally disabled since the date of his injury by accident on 5 May 1997.
2. On 5 May 1997, plaintiff sustained a compensable injury by accident arising out of and in the course of his employment with defendant-employer. N.C. Gen. Stat. § 97-2(6).
3. As a direct and proximate result of plaintiff's work-related injury on 5 May 1997, plaintiff sustained a herniated disc at L5-S1 resulting in disabling back pain. N.C. Gen. Stat. § 97-2(6).
4. From 5 May 1997 until 26 May 1999 when plaintiff reached maximum medical improvement, plaintiff was unable to work for defendant-employer because of his work-related back injury. Further, due to plaintiff's physical restrictions set by Dr. Branch, his current medical condition including his level of pain, his limited education and his prior work experience which was primarily limited to driving a truck, it is unlikely that plaintiff could obtain and maintain employment elsewhere. Therefore, plaintiff continues to be totally disabled following maximum medical improvement. N.C. Gen. Stat. § 97-2; Russell v. Lowes ProductDistribution, 108 N.C. App. 762, 765, 425 S.E.2d 454, 457 (1993).
5. On 26 January 1998, plaintiff attempted a one-day trial return to work but his pain was so disabling that he was forced to seek additional medical treatment. A Form 28U Employee's Request that Compensation be Reinstated After Unsuccessful Trial Return to Work was filed. Since plaintiff's failed return to work on 26 January 1998, plaintiff was determined by two independent treating physicians to be totally unable to return to any type of work through 26 May 1999, the date he reached maximum medical improvement. Plaintiff has been paid temporary total disability compensation at the rate of $257.42 from 6 May 1997, his date of injury, through 25 January 1998. Defendant terminated compensation to plaintiff on 26 January 1998 but subsequently reinstated temporary total disability compensation only. N.C. Gen. Stat. § 97-29.
6. Plaintiff is entitled to additional temporary total disability compensation at the rate of $257.42 for the period of time that he was out of work after 27 January 1998 through the time until he reached maximum medical improvement on 26 May 1999. Since reaching maximum medical improvement, plaintiff has remained totally disabled, and is entitled to continuing total disability compensation in the weekly amount of $257.42 until he returns to work or until further order of the Commission. N.C. Gen. Stat. § 97-29.
7. Plaintiff retains a 25% permanent partial impairment rating for his back.
8. Plaintiff is entitled to the payment of all medical expenses incurred as a result of his compensable injury on 5 May 1997, including all treatment related to his work-related injury incurred on or after 26 January 1998 when defendants unreasonably terminated plaintiff's medical benefits. N.C. Gen. Stat. § 97-25.
9. Plaintiff has shown by the greater weight of credible evidence that he was terminated from his employment on 28 January 1998, as a result of his inability to perform his job due to his work-related injury. At that time, he had been advised by two treating physicians that he was totally disabled and unable to continue work. Plaintiff subsequently underwent a lumbar fusion three months following his failed attempt to return to work.
10. The handwritten Memorandum of Settlement signed by the parties on 12 August 1998 is not enforceable as a Compromise Settlement Agreement under Industrial Commission Rule 502.
 ***********
Based upon the foregoing Stipulations, Findings of Fact and Conclusions of Law, the Full Commission enters the following:
 AWARD
1. Defendants shall pay any additional temporary total disability benefits owed to plaintiff at a rate of $257.42 per week during the period from 28 January 1998 through 26 May 1999, when plaintiff reached maximum medical improvement. Defendants are given a credit for any compensation already paid to plaintiff during said period. Defendants shall continue to pay plaintiff total disability benefits at a rate of $257.42 per week beginning on 27 May 1999 and continuing until further order of the Commission. Defendants are given a credit for any compensation already paid to plaintiff during this period. Any accrued amount shall be paid to plaintiff in a lump sum subject to the attorney's fee approved in paragraph 4.
2. Plaintiff has sustained a permanent partial disability rating of 25%. The more favorable remedy for plaintiff is compensation payable under N.C. Gen. Stat. § 97-29 for total disability.
3. Defendant shall pay all medical expenses incurred or to be incurred in the future by plaintiff as a result of his 5 May 1997 injury, including medical treatment provided by various doctors for his injury after 26 January 1998.
4. A reasonable attorney's fee of 25% of the compensation payable in paragraph 1 is approved for plaintiff's counsel and shall be paid by deducting 25% of the amount due plaintiff and paid directly to plaintiff's counsel. Thereafter, every fourth payment of compensation shall be deducted and paid directly to plaintiff's counsel.
5. Defendant shall pay the costs.
This the ___ day of July, 2001.
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
 S/_____________ THOMAS J. BOLCH COMMISSIONER
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER